UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 MAR 15  PM 3: 55

CLERK

BY _____
DEPUTY CLERK

DEBBIE L. W.,                                    )
                                                )
          Plaintiff,                            )
                                                )
     v.                                         )     Case No. 2:22-cv-00208
                                                )
KILOLO KIJAKAZI, Acting Commissioner            )
of the Social Security Administration,          )
                                                )
          Defendant.                            )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR
AN ORDER REVERSING THE DECISION OF THE COMMISSIONER,
DENYING THE COMMISSIONER'S MOTION TO AFFIRM,
AND REMANDING FOR CALCULATION OF BENEFITS**
(Docs. 12 & 14)

Plaintiff Debbie L. Weston ("Plaintiff") is a claimant for Disability Insurance

Benefits ("DIB") payments under the Social Security Act ("SSA") and brings this action

pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security

Commissioner (the "Commissioner") that she is not disabled.[1] (Doc. 12.) The

Commissioner moves to affirm. (Doc. 14.) Plaintiff filed a reply on June 19, 2023 (Doc.

15), at which time the court took the pending motions under advisement.

After her application for DIB was denied initially and on reconsideration by the

Social Security Administration, Administrative Law Judge ("ALJ") Joshua Menard found

Plaintiff ineligible for benefits because she had not been under a disability within the

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than 12
months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental
impairment or impairments" must be "of such severity" that the claimant is not only unable to do
any previous work but cannot, considering the claimant's age, education, and work experience,
engage in any other kind of substantial gainful work which exists in the national economy. 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

meaning of the SSA from November 1, 2017, through June 30, 2018, her last insured date. On appeal, Plaintiff challenges ALJ Menard's conclusion that she would not be off task at work due to a disorder that causes her to obsessively pick at her left index finger for perceived fiberglass shards. She contends that ALJ Menard failed to consider Listing 12.07 and his findings regarding her mental impairments are not supported by substantial evidence. She requests the court to find her disabled and remand for a calculation of benefits.

Plaintiff is represented by Arthur P. Anderson, Esq. Special Assistant United States Attorneys Jason P. Peck and Vernon Norwood represent the Commissioner.

## I.    Procedural History.

Plaintiff filed an application for DIB on March 21, 2019,[2] alleging disability beginning on November 1, 2017,[3] based on the following impairments: "fibromyalgia, migraine headaches, degenerative disc disease, anxiety disorder, depressive disorder, somatic disorder, posttraumatic stress disorder [("PTSD")], and attention deficit hyperactivity disorder [("ADHD")]." (AR 1308) (citation omitted). The Commissioner denied her application on June 12, 2019, and again on reconsideration on September 4, 2019. Plaintiff filed a request for a hearing on November 13, 2019, which was held before ALJ Menard on April 2, 2020. On April 15, 2020, ALJ Menard issued an unfavorable decision, which Plaintiff appealed. The Appeals Council (the "AC") denied review on December 7, 2020.

On February 5, 2021, Plaintiff requested review from this court. *See Weston v. Comm'r of Soc. Sec.*, No. 2:21-cv-00024 (D. Vt. Feb. 5, 2021), ECF No. 1. On December 6, 2021, the court granted the parties' Assented-to Motion for Entry of Judgment Under Sentence Four of 42 U.S.C. § 405(g), reversing and remanding for further administrative

---

[2] Plaintiff's Complaint, (Doc. 3), and the ALJ's April 15, 2020 decision identify the filing date as March 21, 2019. Plaintiff's motion identifies the filing date as March 19, 2019.

[3] The alleged onset date of November 1, 2017 is "artificial" because it is based on a prior ALJ decision. (Doc. 12-1 at 2, ¶ 6.) On October 22, 2015, Plaintiff filed an application for DIB with an alleged onset date of December 1, 2015. On October 31, 2017, an ALJ found that Plaintiff was not disabled for that time period.

proceedings. On February 15, 2022, the AC remanded the case back to the ALJ, after finding that the previous decision did not contain an adequate evaluation of prior medical findings. On July 21, 2022, ALJ Menard held a hearing at which Plaintiff appeared and was represented by non-attorney representative Meriam Hamada. Plaintiff, Vocational Expert ("VE") Yaakov Taitz, and Medical Expert Chukwuemeka Efobi, M.D., testified. Following the hearing, Ms. Hamada asked to "reopen the claimant's prior Title II application for benefits" because she claimed that Dr. Efobi's testimony that Plaintiff met "the requirements of a mental listing as of May 2017 [was] new and material evidence[.]" (AR 1305) (internal quotation marks omitted).

On September 16, 2022, the ALJ issued an unfavorable decision and denied the request to reopen the prior application because "Dr. Efobi's testimony is clear that the claimant, at most met the requirements of a listing for six months, before experiencing a decrease in symptoms." (AR 1306.) As Plaintiff did not file an objection with the AC within thirty days, ALJ Menard's decision became final.

## II.    ALJ Menard's September 16, 2022 Decision.

Plaintiff was born on March 12, 1962, and was fifty-six years old as of her date last insured. She has a high school education and has not worked since December 31, 2015. Her past employment includes work as a housekeeper.

In order to receive DIB under the SSA, a claimant must be disabled on or before the claimant's date last insured. "Most of the listed impairments are permanent or expected to result in death[,]" and for impairments without a specific time period listed, "the evidence must show that [a claimant's] impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1525. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" [("RFC")] assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national

3

economy that the claimant can perform given the claimant's [RFC], age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation and internal quotation marks omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

At Step One, ALJ Menard found Plaintiff had not engaged in substantial gainful activity from November 1, 2017, her alleged onset date, to June 30, 2018, her date last insured. At Step Two, the ALJ concluded that Plaintiff had the following severe impairments: "fibromyalgia, migraine headaches, degenerative disc disease, anxiety disorder, depressive disorder, somatic disorder, [PTSD], and [ADHD]." (AR 1308) (citation omitted). ALJ Menard found that there was no evidence Plaintiff's asthma resulted in "more than a minimal work-related limitation" and therefore was a non-severe impairment. (AR 1309.) He also found there was no evidence Plaintiff's obesity "imposes more than minimal limitations on the claimant's work[-]related functioning," nonetheless, he considered the impact of obesity in combination with Plaintiff's other impairments. *Id.*

At Step Three, ALJ Menard concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. The ALJ gave "specific consideration" to Listing 1.15 regarding disorders of the skeletal spine resulting in compromise of a nerve root. *Id.* He found Plaintiff did not meet the functional criteria because she presented with "a normal gait" and there was no evidence that she "utilized an assistive device" or was "unable to utilize her upper extremities for fine and gross movements[.]" (AR 1310.) The ALJ also considered

4

migraine headaches under Listing 11.02 and found that "the evidence in the record is not sufficient to establish" Plaintiff suffered migraines with the required frequency. *Id.* In addition, the ALJ considered fibromyalgia following the guidance in Social Security Ruling 12-2p and found "no evidence" that Plaintiff's fibromyalgia caused her to "meet[] or medically equal[] the requirements of a listing." *Id.*

With regard to Plaintiff's mental impairments, ALJ Menard analyzed Listings 12.04, 12.06, 12.11, and 12.15 and found that Plaintiff had a mild limitation in adapting or managing herself; a mild limitation in concentrating, persisting, or maintaining pace; a moderate limitation in understanding, remembering, or applying information; and a moderate limitation in interacting with others. The ALJ concluded that the "paragraph B" criteria were not satisfied because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation. (AR 1310-11.) He also found that the "paragraph C" criteria were not present. *Id.* (internal quotation marks omitted).

At Step Four, ALJ Menard determined Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) except [she] can perform simple tasks and no more than occasional interactions with the public, supervisors, and coworkers.

(AR 1312.)

The ALJ found that Plaintiff's past position as housekeeper qualified as past relevant work and asked VE Taitz hypothetical questions comparing the requirements of a housekeeper to Plaintiff's restrictions. The VE "found that the claimant was capable of this job in both actual and general performance." (AR 1319.)

Considering Plaintiff's work experience, RFC, and the VE's testimony, ALJ Menard determined at Step Five that Plaintiff could perform the job of housekeeper. As a result, ALJ Menard concluded that Plaintiff was not disabled from November 1, 2017, through June 30, 2018.

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review

5

of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citation and internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and "the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). If the court could draw different conclusions after an independent review of the record, the court must still uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case[.]" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (first alteration in original) (citation and internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, however, legal error alone can be enough to overturn the ALJ's decision." *Nunez v. Comm'r of Soc. Sec.*, 2024 WL 262793, at *2 (S.D.N.Y. Jan. 24, 2024) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## B. Whether ALJ Menard Erred at Step Three by Failing to Consider Listing 12.07.

Plaintiff contends that her fingerpicking preoccupation can be classified as a somatic disorder under Listing 12.07 and argues that ALJ Menard "failed to consider this Listing, or the related diagnoses of [obsessive-compulsive disorder ("OCD")] or

6

conversion disorder[.]" (Doc. 12-1 at 22.) In response, the Commissioner states that Drs.
Francis Cook, M.D., and Cajsa Schumacher, M.D., non-examining state agency
consultants, and Drs. Ellen Atkins, Ph.D., and Thomas Reilly, Ph.D., non-examining
state-agency psychologists, each "did not indicate any Listing was met or equaled." (Doc.
14 at 7-8.)

At Step Three, an ALJ is required to determine whether a claimant has an
impairment or combination of impairments that meet or equal the criteria for an
impairment listed in the regulations. "These are impairments acknowledged by the
[Commissioner] to be of sufficient severity to preclude gainful employment. If a
claimant's condition meets or equals the 'listed' impairments, he or she is conclusively
presumed to be disabled and entitled to benefits." *Dixon v. Shalala*, 54 F.3d 1019, 1022
(2d Cir. 1995). "While an ALJ need not discuss every listing, at the very least, the ALJ is
required to make sufficient findings as to the listings relevant to those impairments found
to be severe." *James F. v. Saul*, 2021 WL 816729, at *6 (D. Idaho Mar. 3, 2021).

Listing 12.07 (somatic symptom and related disorders) provides:

These disorders are characterized by physical symptoms or deficits that are
not intentionally produced or feigned, and that, following clinical
investigation, cannot be fully explained by a general medical condition,
another mental disorder, the direct effects of a substance, or a culturally
sanctioned behavior or experience. These disorders may also be
characterized by a preoccupation with having or acquiring a serious
medical condition that has not been identified or diagnosed. Symptoms and
signs may include, but are not limited to, pain and other abnormalities of
sensation, gastrointestinal symptoms, fatigue, a high level of anxiety about
personal health status, abnormal motor movement, pseudoseizures, and
pseudoneurological symptoms, such as blindness or deafness.

20 C.F.R. § Pt. 404, Subpt. P, App 1, Listing § 12.00(B)(6)(a).

Examples of disorders meeting Listing 12.07 "include somatic symptom disorder,
illness anxiety disorder, and conversion disorder." *Id.* at § 12.00(B)(6)(b). To meet the
requirements of Listing 12.07, a claimant must satisfy the criteria of Paragraph A,
demonstrating medical documentation of one or more of the following: (1) symptoms of
altered voluntary motor or sensory function that are not better explained by another

7

medical or mental disorder; (2) one or more somatic symptoms that are distressing, with excessive thoughts, feelings, or behaviors related to the symptoms; or (3) preoccupation with having or acquiring a serious illness without significant symptoms present. *Id.* at § 12.01.

A claimant must also meet the criteria of Paragraph B, exhibiting "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning": (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* An "[e]xtreme limitation" means that a claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* at § 12.00(F)(2)(e). A "[m]arked limitation" means that the claimant's ability to function "in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.* at § 12.00(F)(2)(d).

In Step Two, ALJ Menard found that Plaintiff had numerous severe impairments, including a "somatic disorder," but a "somatic disorder" is not mentioned again in his opinion. In Step Three, ALJ Menard noted that "all appropriate listings have been considered," (AR 1309), but found that none of Plaintiff's mental impairments met "the criteria of listings 12.04, 12.06, 12.11, and 12.15." (AR 1310.) As a result, "[d]espite finding that plaintiff suffered from a severe impairment that constituted a somatoform disorder the ALJ did not evaluate plaintiff pursuant to Listing 12.07[.]" *Alawad v. Kijakazi*, 2023 WL 6130129, at *4-5 (E.D. Cal. Sept. 18, 2023) (reversing and remanding, as "given the nature of the ALJ's error in failing to consider Listing 12.07 the court cannot find that further administrative proceedings would serve no useful purpose").

The medical record does not establish a definitive diagnosis for Plaintiff's fingerpicking preoccupation. Plaintiff refers to it as her "well-established [OCD] or conversion disorder[.]" (Doc. 12-1 at 21.) OCD is covered by Listing 12.06, but a conversion disorder is referenced in Listing 12.07. Providers describe Plaintiff's condition alternatively as OCD, a conversion disorder, or a somatic disorder. *See, e.g.*,

8

AR 439, 1338, 2893. The ALJ acknowledges "the claimant's OCD around her finger issue" and references "concerns over fiberglass in her fingers," a "symptom[] associated with" diagnoses of "anxiety disorder, depressive disorder, [PTSD], and [ADHD,]" impairments that fall within Listings 12.04, 12.06, 12.11, and 12.15. (AR 1314.)

Listing 12.07 has the same Paragraph B criteria as Listings 12.04, 12.06, 12.11, and 12.15. The SSA regulations explain:

> Paragraph B of each listing . . . provides the functional criteria we assess . . . to evaluate how *your mental disorder* limits your functioning. . . . We will determine the degree to which *your medically determinable mental impairment* affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis. . . . To satisfy the paragraph B criteria, *your mental disorder* must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.

20 C.F.R. § Pt. 404, Subpt. P, App 1, Listing § 12.00(A)(2)(b) (emphasis supplied) (internal citation omitted).

ALJ Menard concluded that the Paragraph B criteria were not satisfied because Plaintiff's mental impairments "considered singly and in combination[]" did not cause at least two marked limitations or one extreme limitation. (AR 1310.) Since Listings 12.04, 12.06, 12.07, 12.11, and 12.15 share the same paragraph B criteria, some courts have found that an ALJ did not err when failing to consider a specific Listing because the ALJ found Paragraph B criteria were not satisfied under a separate Listing. *See, e.g.*, *Grega v. Berryhill*, 2019 WL 2610793, at *6 (W.D.N.Y. June 26, 2019) (finding harmless error when an ALJ did not discuss Listings 12.07 and 12.08 "because the ALJ clearly found that [plaintiff's] mental impairments did not meet the requirements of paragraph B for listings 12.04 and 12.06, [so] he implicitly determined that [plaintiff's] impairments did not meet the criteria for listings 12.07 or 12.08") (collecting cases).

Other courts, however, have ruled that SSA regulations require that a claimant's "mental disorder" and "medically determinable mental impairment" under the appropriate Listing be considered in conjunction with the Paragraph B criteria and that it is reversible error if they are not. *See, e.g.*, *Gushen v. Comm'r of Soc. Sec.*, 2017 WL

1807605, at *5-6 (E.D. Mich. Feb. 23, 2017) (remanding and stating that "the ALJ's consideration of the Paragraph B functional limitations for affective disorders and anxiety-related disorders is not necessarily a fair substitute for an independent consideration of whether [Plaintiff's] somatoform disorder satisfied the Paragraph B functional limitations criteria in Listing 12.07") (footnote omitted);[4] *Monsoori v. Comm'r of Soc. Sec.*, 2019 WL 2361486, at *5 (W.D.N.Y. June 4, 2019) (remanding and stating that "the record evidence suggests that Plaintiff's symptoms could meet the requirements in [a Listing]. However, the ALJ did not refer to the Listing specifically; therefore the Court cannot determine whether the ALJ properly considered it.").

In this case, the ALJ's error in failing to consider Listing 12.07 was not harmless because the court cannot determine, as a matter of law, whether consideration of other Listings was a fair substitute for considering Listing 12.07 and because this issue is inextricably intertwined with the amount of time, if any, Plaintiff would be off task and absent from work.

For the reasons stated above, Plaintiff's motion to reverse the decision of the Commissioner is GRANTED.

### C.   Whether Substantial Evidence Supports ALJ Menard's Step Four Findings Regarding Plaintiff's Mental Impairments.

Plaintiff argues that substantial evidence does not support ALJ Menard's conclusion that she would not be off task and absent from work due to her fingerpicking preoccupation. The ALJ found Plaintiff's "behavior, mood and affect [were] normal" through the relevant period. (AR 1311.) He found none of the opinions of Plaintiff's treatment providers persuasive and rejected the opinion of Nurse Practitioner Erika A. Currier ("NP Currier"), Plaintiff's primary treatment provider, that Plaintiff "would likely

---

[4] Citing 20 C.F.R. § Pt. 404, Subpt. P, App 1, Listing § 12.00(A) for the proposition that: "The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A." The current version of this section uses different language: "a. Paragraph A of each listing . . . includes the medical criteria that must be present in your medical evidence. b. Paragraph B of each listing . . . provides the functional criteria we assess, in conjunction with a rating scale . . . to evaluate how your mental disorder limits your functioning."

be absent four or more days per month or off task a significant portion of the workday" which he found "appears [to be] based purely on speculation." (AR 1318.) The ALJ similarly concluded that the opinion of Plaintiff's neurologist, Adam S. Sprouse-Blum, M.D., that Plaintiff's mental health condition would make it challenging for Plaintiff to remain employed "is inherently neither valuable nor persuasive[.]" *Id.* at 1319.

According to Plaintiff, "[t]he ALJ virtually ignored [Plaintiff's] well-established [OCD] or conversion disorder and barely mentions [Plaintiff's] finger picking in his decision." (Doc. 12-1 at 21.) This is a fair characterization of the ALJ's opinion. Plaintiff further contends that, when evaluating the persuasiveness of differing medical sources, ALJ Menard both erroneously disregarded long-term treating providers' opinions and erroneously relied on non-examining medical experts' opinions.

The Commissioner counters that "by selectively citing to the record to support her arguments," Plaintiff seeks a reweighing of the evidence in her favor, "but she cannot (and has not) shown that no reasonable factfinder could have weighed the evidence as did the ALJ." (Doc. 14 at 9.) The Commissioner contends that substantial evidence mandates deference to the ALJ's decision.

"When making a determination of disability, an ALJ must consider all of the available evidence in the individual's case record, including the opinions of medical sources." *Karen S. v. Comm'r of Soc. Sec.*, 2020 WL 4670911, at *13 (D. Vt. Aug. 11, 2020) (alteration, citation, and internal quotation marks omitted). ALJs must articulate how they considered medical opinions and prior administrative findings, as well as how persuasive they found them. *See* 20 C.F.R. § 404.1520c(a)-(b).

Pursuant to the applicable regulations, an ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). Instead, an ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness in accordance with five factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including: (i) the length of treatment relationship, (ii) the frequency of examinations, (iii) the purpose of the treatment

11

relationship, (iv) the extent of treatment relationship, and (v) the examining relationship); (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *See id.* § 404.1520c(c).

The factors of supportability and consistency "are the most important factors [an ALJ] consider[s]" when determining the persuasiveness of a medical opinion. *Id.* § 404.1520c(b)(2). An ALJ must therefore articulate how he or she considered the supportability and consistency of a medical opinion and may, but need not, address the remaining three factors. *Id.* "[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at *7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

### 1. Whether the ALJ Erred in Concluding that Nurse Practitioner Currier's Opinions Were Not Persuasive.

Plaintiff contends ALJ Menard erroneously discounted the opinion of NP Currier, finding: (1) she used checkboxes on forms; (2) she did not support her opinions with objective findings; (3) she provided conservative treatment inconsistent with her opinions; (4) her determination of Plaintiff's off-task time is unsupported; and (5) she is not a mental health provider.

ALJ Menard acknowledged that non-examining agency consultants, Drs. Atkins, Reilly, Cook, and Schumacher, all considered evidence prior to Plaintiff's last date insured of June 30, 2018, which the ALJ stated "increases the persuasiveness of their findings." (AR 1316.)[5] The court thus does so as well. NP Currier, Plaintiff's primary care provider, first evaluated Plaintiff on August 8, 2016, and met with her thereafter on a regular basis. During their first visit, NP Currier observed that Plaintiff was "cr[ying] throughout the entire office visit[,]" and her "[l]eft pointer [index] finger skin [was] dry and flaky from the [distal interphalangeal joint] to the tip with the outer layer essentially clipped away." (AR 478.) She noted that "[t]his was not a typical new patient visit as I

---

[5] The ALJ, however, refused to fully credit this evidence, observing that "any reference to evidence outside [the period under review] is for contextual purposes only." (AR 1306.)

could not stay on task with her. . . . I believe that her [pre]occupation with her finger is significantly impacting her well-being and is likely part of a much larger psychiatric problem." *Id.*

On March 8, 2017, NP Currier recorded that Plaintiff "continues to compulsively pick at her finger at least 14 hours per day." (AR 445.) Approximately a month later, NP Currier's treatment note states that Plaintiff was "[u]p to 1 [a.m.] working on finger[,]" "[v]ery distraught about painful finger[,]" and "[d]oesn't know how much longer she can take it." (AR 441.) During this April 5, 2017 visit, Plaintiff asked for pain pills to "dull the pain enough [so] she will be able to get the fiberglass out." *Id.* In May 10, 2017 visit notes, NP Currier found that Plaintiff "cannot stop perseverating on the fiberglass embedded in her finger." (AR 437.) She opined:

> that it would be very difficult for [Plaintiff] to hold a job given both her mental state and physical state. She is obsessing over fiberglass in her finger that I do not appreciate. She will spend 14-18 hours per day digging at her finger trying to remove the fiberglass. In addition to her finger OCD, she has severe PTSD and major **depression**. I have never had an office visit with her that she did not perseverate and cry throughout.

(AR 439) (emphasis in original).

On May 10, 2017, NP Currier submitted a Medical Source Statement (the "2017 Statement"). In the Manipulative Limitations section of the physical section of the 2017 Statement, she checked boxes indicating that Plaintiff could "Never" do "Fingering" or "Feeling" activities and wrote beneath that "[p]ain in hands due to perceived fiberglass has been all-consuming mentally and likely would impede . . . fine-motor skills needed for a job using her hands." (AR 2397.) NP Currier noted that Plaintiff would "need to take unscheduled breaks" "at least every hour" for "10-15 minutes" each. (AR 2396) (emphasis omitted). She checked a box indicating that Plaintiff's condition would cause her "to be absent from work" "[m]ore than four days per month[.]" *Id.* In the checklist in the mental section of the 2017 Statement, NP Currier characterized Plaintiff as "Markedly Limited" in eight out of eleven categories. (AR 2401.)

Thereafter, during a visit on September 7, 2017, NP Currier recorded that Plaintiff "does feel like she is making strides in her mental health. She tells me today that she feels 'at the crest of feeling better instead of miles away'." (AR 425.) On November 2, 2017, NP Currier found Plaintiff was "[d]oing well overall." (AR 419.) On December 22, 2017, however, NP Currier observed that Plaintiff "continues to pick at her finger[,] and she is confident that there is fiberglass in it." (AR 416.) NP Currier "[c]lipped a piece of the calloused skin from [Plaintiff's] left finger[]" to send for analysis of presence of any "fiberglass shards[.]" (AR 418.)

On February 14, 2018, Plaintiff visited NP Currier for facial pain associated with her headaches, and NP Currier's review of systems included that Plaintiff was "[p]ositive" for malaise/fatigue, headaches, and depression and was "nervous/anxious[.]" (AR 411.) Her current prescriptions on file included Imitrex.[6] On May 10, 2018, NP Currier recorded Plaintiff was "[b]asically house bound because [Plaintiff] doesn't want to be in public[,]" and she characterized Plaintiff's depression, anxiety, and PTSD as "severe." (AR 398.) NP Currier observed that Plaintiff was "[s]till picking at her finger[]" and "[w]orks on it [more than] 18 hours a day[,]" as "[w]henever she is awake she is trying to get out the fiberglass." *Id.* NP Currier included mental health diagnoses of ADHD, anxiety, depression, and PTSD.

On March 26, 2020, NP Currier submitted a Medical Source Statement (the "2020 Statement") assessing Plaintiff's "functional abilities on or before June 30, 2018[.]" (AR 734, 2967, 2980.) Her report was based on "[m]any in[-]person visits dating back to 2016 relating to her complex mental health as well as her physical capabilities and limitations regarding chronic pain and fibromyalgia, chronic migraine." (AR 740, 2972, 2985.) NP Currier observed that Plaintiff's work-related abilities were "[l]imited to [less than] 1 [hour] [per] day given chronic pain, fibromyalgia[, and] chronic migraine. Likely more debilitating[,] however[,] is her severe ADHD, depression, PTSD[, and] OCD[.]" (AR 734, 2967, 2980.) She stated that Plaintiff "cannot focus on much else besides her finger,

---

[6] "Imitrex (sumatriptan) [is] a currently popular migraine treatment[.] 8 Attorneys Medical Advisor § 74:38 (2024).

which she believes is embedded and debilitated with fiberglass. I believe this to be a manifestation of anxiety and OCD[.]" *Id.*

NP Currier checked the box that Plaintiff would be off task for "[m]ore than 20% of an 8 hour work day" because she was "[l]imited by anxiety, OCD, ADHD—She would not be able to stay on task[.]" (AR 736, 2969, 2982.) She also concluded that Plaintiff would be absent "[m]ultiple times per week[.]" (AR 739.) NP Currier explained:

> [Plaintiff] does not have the cognitive stamina to focus on tasks, sustain an ordinary routine or follow detailed work instructions. She is completely overwhelmed with anxiety and depression and has OCD related to what she believes to be fiberglass in her finger (despite much testing, specialists, imag[ing], biopsy, there is no evidence of fiberglass) but it is very real to her (delusion).

(AR 735, 2968, 2981.)

In the exertional limitations section, NP Currier marked the checkbox that Plaintiff could lift "less than 10 pounds[,]" (AR 737, 2970, 2983), and her ability to perform the manipulative functions of reaching, handling, fingering, and feeling was for "less than 1/3 of the work day[.]" (AR 738, 2971, 2984.) In summary, NP Currier opined that Plaintiff had "[s]evere mental health limitations due to ADHD, depression, PTSD, [and] OCD as well as physical limitations related to fibromyalgia, chronic back pain and chronic migraine [that] would make it difficult for [her] to be employable." (AR 740, 2972, 2985.)

During a visit on September 13, 2018, NP Currier noted that Plaintiff's finger was "still a major focus[,]" and Plaintiff was "[f]rustrated that nobody c[ould] help her with the fiberglass in her finger[.]" (AR 391.) She "[w]orks to get the fiberglass out of her finger with clippers sometimes until 4 [a.m.,]" "[c]an't stop once she gets started[,]" and this is "[a]ffecting all her relationships." *Id.* NP Currier observed Plaintiff crying, with a frustrated affect, and "[u]sing clippers to clip the fiberglass from her finger and hand throughout [the office visit]." (AR 394.) Plaintiff showed NP Currier the perceived fiberglass, but NP Currier could not see or feel it. She, however, noted that Plaintiff's left pointer finger was calloused. In her treatment notes, NP Currier wrote:

> Habitual self-excoriation[.] Continued focus on getting fiberglass out of finger. Uses clippers during all waking hours to try to work it out. Always feels like she is making progress and is close. She is very frustrated that nobody can figure out how to help her. She feels very little hope and doesn't want to live her next 20 years like this. . . . I do believe this is a true OCD/stress reaction that is very real to [Plaintiff]. . . . I would appreciate help on this difficult care from psychiatry.

*Id.* Nurse Currier placed a referral for a "formal psychiatric evaluation" and a prescription for Risperdal.[7] *Id.*

On October 4, 2018, NP Currier observed Plaintiff "is very pleased at how [the Risperdal] is helping her anxiety and sleep[,]" and she has "[l]ess obsession with her finger." (AR 387) (emphasis omitted). On October 31, 2018, NP Currier noted that Plaintiff was "[f]eeling 'better than [she] ha[s] in a long, long time'" but it was "[s]till very hard [for her] to go out into crowds[,]" and a "[r]ecent trip to Target 'was a disaster[,]'" and she "[h]ad to go wait in the truck." (AR 382.) NP Currier diagnosed "[h]abitual self-excoriation[,]" (AR 385), among other mental health ailments, and noted Plaintiff was positive for "depression" and "nervous/anxious" but both were "improving[.]" (AR 384) (emphasis omitted).

On December 11, 2020, NP Currier noted that for Plaintiff, "[e]verything is very overwhelming[,]" including her hand pain, and that "[s]he believes she has fiberglass in her hands, wrapped around her finger bones." (AR 2932.) She observed "[e]xcoriations to both [Plaintiffs'] hands from clipper use (she is trying to dig out the fiberglass that she believes is wrapping around her finger bones)." (AR 2933) (emphasis omitted).

On January 22, 2021, NP Currier again noted "[h]abitual self-excoriation" but stated Plaintiff's "[s]ymptoms seem[] to be improved on Clomipramine[,]"[8] and "I do believe that she benefits from using marijuana which lessens her chronic pain, OCD, and PTSD." (AR 2908.)

---

[7] "Risperidone (Risperdal) is a new antipsychotic with a different chemical structure from other agents of that type." 3 Attorneys Medical Advisor § 30:91 (2024).

[8] "Clomipramine (Anafranil), recently approved by the FDA, appears to be the most effective medication presently available for OCD." 6 Attorneys Medical Advisor § 45:7 (2024).

On April 23, 2021, NP Currier explained in visit notes under the heading

"**[s]omatic delusion disorder**":

> [Plaintiff] has long-term anxiety and depression as well as a somatic
> delusion that she has fiberglass strands wrapped around her fingers from
> years of building fence with fiberglass poles. For about 10 years she has
> been fixated on getting the fiberglass out of her hands and fingers. She
> picks at her hands with clippers for upwards of 20 hours/day, sometimes
> affecting her sleep. She has been . . . unable to work or generally be
> productive. She cries every day. She has had extensive work-up which
> proved she does not have fiberglass in her hands however she refuses to
> believe this. She sometimes talks about amputating her hands but she is
> unsure that this will really cure her as she is afraid that the fiberglass is
> traveling throughout her body. . . . I do feel that [Plaintiff] would benefit
> from psychiatric care for her delusions and I appreciate any insight from
> psychiatry.

(AR 2893) (emphasis in original).

With regard to the persuasiveness of NP Currier's opinions, ALJ Menard noted
that NP Currier used "checklist style forms without reference to any objective medical
evidence to support the specific limitations in the opinion." (AR 1318.) The fact that NP
Currier used checklists to summarize her opinions does not automatically render them
unpersuasive. *See Colgan v. Kijakazi*, 22 F.4th 353, 362 (2d Cir. 2022) (concluding an
ALJ's reasoning for rejecting medical source's opinion was flawed where the physician's
"check-box form opinion was supported by voluminous treatment notes gathered over the
course of nearly three years of clinical treatment"); *Laurie B. v. Kijakazi*, No. 2:22-cv-
195 (D. Vt. Nov. 17, 2023), ECF Doc. 10 at 14 ("When evaluating supportability, an ALJ
may not discount a medical opinion solely because it is provided in a checklist form."). It
is also inaccurate to assert there was no "objective medical evidence" to support the
specific limitations in NP Currier's opinion. (AR 1318.) To the contrary, the record is
replete with clinical observations, medication prescriptions, and other interventions.

ALJ Menard further found that NP Currier provided "only conclusory statements
regarding [Plaintiff's] functioning, or reference to subjective complaints by [Plaintiff]
rather than any reference to objective findings to support the extreme limitations
contained in her opinion." *Id.* He concluded that she "provides no explanation for the

17

extreme manipulative and postural limitations included in her opinion, which would essentially render [Plaintiff] bedridden" and "no objective findings that would support such limitations." *Id.*

NP Currier's opinions and observations are not based solely on Plaintiff's self-reports. In any event, "[p]sychiatric testing is inherently based on subjective reports. A medical diagnosis will often be informed by the patient's subjective description of his or her symptoms[,]" which "is all the more true in cases involving mental health, which tend to be less susceptible to objective testing and assessment." *Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022). Although a treating provider's opinions are no longer afforded special weight, "treating provider assessments are particularly probative where, as here, the claimant's symptoms (a) can be expected to wax and wane over time and (b) would likely be aggravated if she was exposed to the stress demands of competitive, remunerative work on a consistent basis." *Ingrid T.G. v. Comm'r. of Soc. Sec.*, 2022 WL 683034, at *7 (S.D.N.Y. Mar. 8, 2022).

The ALJ did not credit NP Currier's opinion that Plaintiff had significant limitations because this finding was "inconsistent with the primarily conservative nature" of her treatment. (AR 1318.) The treatment was limited, however, due to NP Currier's belief that Plaintiff's symptoms were the product of delusions. To prove this, she sent a clipping of Plaintiff's finger to a lab for fiberglass analysis. *See* AR 418. NP Currier diagnosed a mental health disorder, repeatedly sought a psychiatric consult, and prescribed an antipsychotic to treat it. This arguably was not conservative treatment. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 2020 WL 7022236, at *5 (D. Ariz. Nov. 30, 2020) (noting that "[d]efendant appears to be arguing that anything short of in-patient hospitalization for a mental disorder is considered 'conservative treatment,' but does not cite any case law for this proposition").

ALJ Menard found that NP Currier's treatment notes "contain [an] overall benign mental status examination and note improvement in the claimant's pain with prescribed

medical marijuana[.]"[9] (AR 1318.) He also found Plaintiff "regularly described" as presenting "with normal mood, affect, behavior, judgment, and thought content[.]" (AR 1315.) This reflects a cherry picking of NP Currier's treatment notes, the vast majority of which do not reflect a benign examination, normal behavior, or normal thought content.[10] *See Pamela K. v. Comm'r of Soc. Sec.*, 2020 WL 7382658, at *10 (D. Vt. Dec. 16, 2020) ("An ALJ may not cherry pick medical opinions that support his or her opinion while ignoring opinions that do not.") (alteration adopted) (internal quotation marks omitted).

In addition, "it is possible for a claimant to appear normal at a medical appointment while suffering from serious mental illness." *See Jorge D. v. Berryhill*, 2020 WL 1482625, at *8 (D. Vt. Mar. 27, 2020). The Second Circuit has "cautioned ALJs against scouring medical notes to draw their own conclusions based on isolated descriptions." *Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, 10 (2d Cir. 2020). This is because "[p]laintiff's presentation at primary care appointments reveals relatively little about her overall mental health condition because the appointments only constitute 'snapshot[s]' at single moments in time." *Jennifer W. v. Comm'r of Soc. Sec.*, 2020 WL 549357, at *13 (D. Vt. Feb. 4, 2020) (second alteration in original) (citation omitted). Indeed, the same treatment notes that found a "benign" mental status also concluded that Plaintiff suffered from depression, anxiety, and a persistent fingerpicking

---

[9] The prescription of medical marijuana appears primarily for Plaintiff's fibromyalgia. *See* AR 419, 421 (NP Currier wrote in November 2, 2017 visit notes, "[Plaintiff] is here for fibromyalgia follow up. She needs her medical marijuana paperwork renewed. Doing well overall. MJ helps with fibro pain more than anything that she has ever been on[,]" and "Fibromyalgia. Still with pain but doing much better on medical marijuana[.] . . . Would recommend continuing medical marijuana. Paperwork completed today and sent home with patient"); AR 416 (NP Currier wrote in December 22, 2017 visit notes "[f]ibro pain is helped most by MJ, which she is using daily").

[10] *See, e.g.*, AR 439 (observing in May 10, 2017 treatment notes that "I have never had an office visit with [Plaintiff] that she did not perseverate and cry throughout"); AR 416 (noting on December 22, 2017, that Plaintiff "continues to pick at her finger[,] and she is confident that there is fiberglass in it"); AR 394 (recording on September 13, 2018 that Plaintiff was "[u]sing clippers to clip the fiberglass from her finger and hand throughout [the office visit]"); *see also* AR 431 (describing how during a visit on August 16, 2017, Dr. Kennedy observed Plaintiff "unconsciously grab[] [her cuticle cutter] and beg[i]n to again cut superficially at her skin").

preoccupation.[11] *See Rucker*, 48 F.4th at 94 ("[I]t was not permissible for the ALJ to 'cherry-pick[]' the positive aspects of the progress reports to discount [treating physician's] opinion as unsupported by the evidence.") (second alteration in original) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019)).

ALJ Menard additionally noted that NP Currier's opinions were inconsistent with Plaintiff's "own descriptions regarding her abilities to complete activities of daily living despite her impairments[.]" (AR 1318.) Plaintiff reported she was capable of "caring for her dog, preparing simple meals, performing household chores, and making jewelry[.]" (AR 1310.) While Plaintiff's ability to perform daily activities is a proper factor for the ALJ to consider,[12] ALJ Menard "did not explain how the performance of these limited activities . . . translates into the ability to perform substantial gainful work . . . in a typical competitive workplace environment." *Maskell v. Berryhill*, 2017 WL 2779638, at *8 (D. Vt. June 27, 2017) (alteration in original) (citation and internal quotation marks omitted).[13] Most importantly, ALJ Menard failed to address whether Plaintiff was able to

---

[11] *See, e.g.*, AR 419-20 (treatment notes from November 2, 2017, stating that Plaintiff was "[d]oing well overall[]" and "alert and oriented" but also that she was "[p]ositive" for depression and was "nervous/anxious"); AR 416-18 (treatment notes from December 22, 2017, stating that Plaintiff was "[m]uch less teary, sad[]" and "alert and oriented" but also that she was "[p]ositive" for depression and "continues to pick at her finger[,] and she is confident that there is fiberglass in it"); AR 411-12 (treatment notes from February 14, 2018, describing Plaintiff as having "normal mood and affect[]" with "normal[]" behavior but also noting that she was "[p]ositive" for depression and "nervous/anxious"); AR 398, 400 (treatment notes from May 10, 2018, stating that Plaintiff had "normal mood and affect[]" with "normal[]" behavior but was "[b]asically house bound" and "[w]henever she is awake she is trying to get out the fiberglass").

[12] *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (holding that an ALJ "must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources") (alterations, citation, and internal quotation marks omitted); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[A] claimant need not be an invalid to be found disabled under the [SSA].") (citation and internal quotation marks omitted).

[13] *See also Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022) ("[W]e disagree with the ALJ that [the claimant's] ability to engage in certain activities of daily living—such as caring for her two children, preparing meals and washing dishes, and driving to her medical appointments— provided substantial record evidence to discount [a doctor's] medical opinion."); *Claudio-Montanez v. Kijakazi*, 2022 WL 17819123, at *3 (2d Cir. Dec. 20, 2022) ("[T]he ALJ's reliance

perform these same or equivalent tasks for a full workday in a competitive work environment.

With regard to the supportability factor, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). Plaintiff sought treatment from providers other than NP Currier before, during, and after the period under review. "An ALJ is ordinarily not required to consider evidence outside of the relevant period unless the evidence relates to the claimant's condition during the relevant period." *Robert V. v. Kijakazi*, 2022 WL 4536838, at *3 (D. Conn. Sept. 28, 2022). Evidence relating to Plaintiff's fingerpicking preoccupation is relevant to her disorder during the period at issue as it indicates the condition's severity and duration.

During a visit on June 19, 2015, Physician Assistant ("PA") Rick H. Dooley noted that Plaintiff has "a long history of anxiety/depression, PTSD and ADHD." (AR 327.) Less than one month later, on July 2, 2015, Dr. David W. Clauss examined Plaintiff at an emergency room ("ER") visit where Plaintiff presented with "hand pain bilaterally due to fiberglass. [She] reports [two] weeks ago pulling fiberglass stakes out of the ground[,]" and that her pain has worsened since then. (AR 366.) Dr. Clauss noted "[b]ilateral hand abrasions with persistent spontaneous expulsion of tiny fiberglass particles. No current visualized foreign bodies to remove at this time." (AR 368.) He diagnosed "[m]ultiple fiberglass [f]oreign bodies in bilateral hands[.]" *Id.*

On January 12, 2016, Plaintiff visited PA Dooley, who observed that Plaintiff "[h]as a lot of life stressors that are increasing [her depression and anxiety], but the pain in her hand is what has pushed her over the edge." (AR 673, 1025.) PA Dooley's diagnoses of Plaintiff included migraine without aura, not intractable, without status migrainosus, fibromyalgia, major depressive disorder (single episode, unspecified),

---

on some of [the claimant's] activities, such as cooking, cleaning, doing laundry, shopping, enrolling in school, or caring for her mother is misplaced.").

generalized anxiety disorder, and "[r]esidual foreign body in soft tissue[,]" which he described as a "very interesting delusion that her hand is full of fiberglass." (AR 675, 1027.) Plaintiff subsequently stopped visiting PA Dooley because they "had a falling out." (AR 476) (internal quotation marks omitted). She transferred to NP Currier for primary care and, in her initial visit on August 8, 2016, was described as "very upset that everybody thinks she is crazy and nobody believes her about the fiberglass." (AR 478.)

A. Evan Eyler, M.D., conducted a psychiatric consultation of Plaintiff on September 26, 2016, at NP Currier's request. Dr. Eyler recorded that Plaintiff's symptoms "worsened recently, during the last year, due to pain in her finger from an accident that resulted in fiberglass shards becoming stuck in her finger." (AR 1193.) In the mental status exam section, Dr. Eyler described Plaintiff's "[p]sychomoter activity was a bit increased[,] [s]he fidgeted with a pen[,] . . . [her] [t]hought process was sometimes (appropriately) perseverative on areas of distress, . . . [and her] [i]nsight and judgment appeared influenced by pain, chronic mood symptoms, chronic trauma symptoms, and related matters[.]" (AR 1194.) Dr. Eyler diagnosed PTSD, OCD, chronic pain, ADHD, and persistent depressive disorder and opined that "[Plaintiff] feels that she is not able to work and it is difficult to see how she would be able to do so, though this was not a formal disability evaluation." (AR 1195.)

Psychotherapist Jess DiGiorgianni ("Psychotherapist DiGiorgianni") began treating Plaintiff on March 27, 2017.[14] During the first visit, he observed that Plaintiff's "psychological issues . . . are now being compounded by a number of physical issues. One problem in particular, fiberglass in her hands, has been particularly vexing and she broke down in tears on several occasions during the session describing her pain and the lack of assistance she has received from local physicians[.]" (AR 1285.) On April 3, 2017, he recorded that Plaintiff's "hand and finger were feeling better and she felt she had made a great deal of progress this weekend getting some of the fiberglass out." (AR 1286.) After a visit on April 11, 2017, he documented that the "fiberglass in her hands is

---

[14] ALJ Menard uses "Ms." to refer to Psychotherapist DiGiorgianni in his opinion. However, Plaintiff uses "Mr." in her motion.

22

still bothering [Plaintiff]. She continues to dig into her hand in several areas with an implement trying to get the larger particles out." *Id.* On June 12, 2017, he observed that Plaintiff "continues to obsess about the fiberglass in her hand and entered the session agitated and restless, continually rubbing her hands and manipulating the finger where she says the biggest fragment is located." (AR 658.)

Thereafter, on June 26, 2017, Psychotherapist DiGiorgianni "expressed [his] concern about the damage [Plaintiff] is doing to her index finger by constantly digging at it" and noted that Plaintiff recently went to the ER, "driven to distraction by the discomfort in her left index finger which she thinks has fiberglass in it." *Id.* ER treatment providers "may have suggested that her preoccupation with the finger is more psychological than physiological[,] and Mr. DiGiorgianni "tried to present to her the reasoning underlying a conversion disorder hypothesis but she was completely resistant to this, declaring that she knows there is something in there and that she cannot get on with her life until it is gone." *Id.*

Psychotherapist DiGiorgianni recorded on August 21, 2017, that Plaintiff "feels like she has made progress with her finger." (AR 656.) On September 7, 2017, he stated that Plaintiff was "feeling better this week[]" but noted "the ongoing problem of fiberglass in her finger[,]" as "she is often up at all hours of the night digging at her finger with a number of implements[.]" (AR 655.) He "discussed some strategies to manage the pain and annoyance of [Plaintiff's] finger" and "suggested that [Plaintiff] allow herself some time limit for working on her finger[.]" *Id.*

In a visit with Psychotherapist DiGiorgianni on October 6, 2017, Plaintiff identified that "she was 'close to being' done with her finger, having 'drawn blood' and gotten some of the fibrous material out of the finger." (AR 654.) On December 8, 2017, he observed that Plaintiff "related that she has been doing well" and "feels as though she is 'very close' to getting out the foreign material in her finger[.]"[15] (AR 652.) On April 13, 2019, he resumed treatment of Plaintiff and wrote that "[s]he continues to dig at her

---

[15] ALJ Menard found Psychotherapist DiGiorgianni's opinions unpersuasive, a finding that Plaintiff does not challenge.

23

finger" and is "[l]argely homebound and finding it difficult to focus and form social connections." (AR 651.)

PA Paul Jerard examined Plaintiff at a June 21, 2017 ER visit for "foreign body sensation in her left hand." (AR 2383.) He noted that she was "anxious, upset, and tearful" with a "chronically inflamed eczematous appearing left index finger with cracking and calluses[]" showing "[m]ultiple cracks in the skin and mild patchy redness." (AR 2384.)

Psychiatrist Suzanne M. Kennedy, M.D., evaluated Plaintiff on August 16, 2017, and noted that "[s]he has difficulty resisting the urge to remove portions of her skin. She acknowledges persistent intrusive concerns of the fiberglass throughout the days." (AR 428.)[16] She described how Plaintiff "has felt more depressed over the past few years due to multiple medical problems[,]" that her "[e]nergy is reduced due to poor sleep[,]" and her "[c]oncentration is reduced." *Id.*

In the psychiatric review of systems section, Dr. Kennedy opined that Plaintiff had "[e]levated[]" anxiety with "persistent concerns over finger" and cognitively had "[r]educed attention/concentration." *Id.* She noted that Plaintiff "presents with symptoms consistent with significant OCD which is clearly impacting her daily functioning." (AR 431.) She observed that Plaintiff "carried a cuticle cutter with her and had been using it in the waiting room prior to the assessment[,]" and her "[t]hought content [included] persistent preoccupation with presence of fiberglass fibers in her left index finger." *Id.* (emphasis omitted). During this visit, Dr. Kennedy found Plaintiff "was able to resist

---

[16] The ALJ did not mention Dr. Kennedy, her diagnoses, or her opinions in his decision. In one instance, he cites to her findings in the administrative record without identifying that they were part of her psychiatric evaluation. *See* AR 1314 ("The claimant has reported symptoms associated with these impairments, including persistent intrusive concerns over fiberglass in her fingers, an intense need for cleanliness in her home, flashbacks, elevated startle response, nightmares, irritability, poor sleep, reduced energy, and concentration.") (citing Exhibit C2F, p. 59). "ALJs must 'articulate . . . how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record[.]'" *Shawn H. v. Comm'r of Soc. Sec.*, 2020 WL 3969879, at *4 (D. Vt. July 14, 2020) (first, second, and third alterations in original). Here, the "ALJ failed to fully explain his consideration of all of the medical opinion evidence[.]" *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021).

using it when instructed to do so[,]" but also "[o]n one occasion, [Plaintiff] unconsciously grabbed it and began to again cut superficially at her skin." *Id.* Dr. Kennedy included mental health diagnostic impressions of OCD, PTSD, major depressive disorder, and "[s]omatic symptom disorder with predominant pain (chronic pain disorder)[,]" *id.*, and noted Plaintiff's "ongoing PTSD symptoms and depression which further complicates her functioning." *Id.* (emphasis omitted). She wrote in the "[p]lan" section to "[c]onsider trial of sertraline[17] to specifically target OCD symptoms. This could be introduced in a cross taper fashion with slow removal of venlafaxine."[18] (AR 432.)

On January 2, 2018, Dr. Kennedy spoke with Plaintiff over the phone and "recommended websites for information on OCD and encouraged [Plaintiff] to remain in CBT work with her psychologist." (AR 416.)

Plaintiff visited the ER with "10/10" pain in her left index finger on March 22, 2018, reported from "20+ years of accumulated fiberglass pieces from repeatedly driving fiberglass poles into the ground." (AR 406.) The ER treatment providers observed Plaintiff to be "distressed and tearful." *Id.* At the time, Plaintiff had "cut her hands in many places over the years in attempt to remove fiberglass[]" and "recently cut the proximal left index finger phalange 0.5 cm superficial trying to remove the fiberglass herself." *Id.*

On March 26, 2018, Plaintiff sought treatment at the South Burlington Tilley Orthopedic Center where PA Emily Kavouksorian evaluated Plaintiff for "left index finger pain and associated diffuse hand pain that originated from fiberglass splinters." (AR 404.) In a review of systems, PA Kavouksorian included change in mood or behavior and headaches. PA Kavouksorian noted that Plaintiff had been using fiberglass fencing four years ago and since then, "she has been picking at her left index finger and trimming the skin/exploring for foreign body with a cuticle scissor[.]" *Id.* Plaintiff reported "10/10 pain[,]" and "[h]er pain [wa]s severe enough that she . . . ask[ed] if her

---

[17] Sertraline (Zoloft) is an antidepressant. *See* 3 Attorneys Medical Advisor § 30:73 (2024).

[18] "Venlafaxine hydrochloride (Effexor) is a new antidepressant that is chemically different than other antidepressants." 3 Attorneys Medical Advisor § 30:86 (2024).

finger can be amputated if [the providers] cannot remove the foreign body." *Id.* PA Kavouksorian found "extremely thickened callused skin over the left index finger[]" with "[s]ensation diminished[,]" so she ordered an MRI "to see if there is anything that can be surgically removed." (AR 405) (emphasis omitted). The MRI did not reveal a "distinct mass or foreign body that [the providers] could surgically excise[]" but found "[s]mall joint effusion and synovitis[19] at the 2nd PIP joint[,[20] and] [m]ild to moderate degenerative changes at the interphalangeal joints[21] of the index finger." (AR 403.)

Dr. Sprouse-Blum began treating Plaintiff on October 14, 2015. He recorded on January 17, 2018 that Plaintiff has seen "liaison psychiatrist Dr. Kennedy on [August 16, 2017] and started a cross taper of venlafaxine to sertraline in hopes of improved control of OCD symptoms." (AR 413.) On March 12, 2020, he authored a letter provided to Plaintiff's attorneys wherein he stated that Plaintiff "has significant psychiatric comorbidities including [OCD], PTSD, and depression which interfere with her daily functioning. Collectively, I can see how her medical conditions would make it challenging for her to stay employed." (AR 733.)

Dr. Elizabeth Landell, a family medicine physician, examined Plaintiff on August 13, 2021, in a primary care office visit. She diagnosed somatic delusion disorder, described Plaintiff as "distraught about her concerns that fiberglass has wound around the bones inside her hand and is traveling up her arms[,]" and opined that "[t]his is clearly a delusional disorder." (AR 2878.)

In addition, state agency consultants Dr. Atkins and Dr. Reilly submitted assessments of Plaintiff for the period under review in May and September of 2019, respectively. These consultants, whose opinions ALJ Menard deemed persuasive, found that Plaintiff had severe mental health impairments of anxiety and obsessive-compulsive

---

[19] Synovitis is "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." Stedmans Medical Dictionary 891270.

[20] Proximal interphalangeal joints are "the synovial joints between the proximal and middle phalanges of the fingers and of the toes." Stedmans Medical Dictionary 464230.

[21] Interphalangeal joints of the hand are "the hinge synovial joints between the phalanges of the fingers." Stedmans Medical Dictionary 463840.

disorders; depressive, bipolar, and related disorders; trauma and stressor-related disorders; ADHD; and somatic symptom and related disorders. They each noted that she was "[m]oderately limited" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and "[m]oderately limited" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (AR 91-92, 109); *see also Bruner v. Colvin*, 2017 WL 4215942, at *5 (W.D.N.Y. Sept. 22, 2017) (finding a moderate limitation of this type to support a hypothetical of twenty percent off-task time). Nonetheless, the ALJ found only mild limitations in Plaintiff's ability to adapt or manage herself and in concentrating, persisting, or maintaining pace.

Drs. Atkins and Reilly further found that Plaintiff would experience "episodic exacerbation in anxiety, depression, [and] pain perception [which] can temporarily undermine cognitive efficiency." (AR 92, 109.) In the Appeals Council's February 15, 2022 remand, it directed the ALJ to consider this finding:

> The hearing decision does not contain an adequate evaluation of the prior administrative medical findings in Exhibits C1A and C3A. State agency psychological consultants found, in part, that episodic exacerbations of the claimant's mental impairments can temporarily undermine her cognitive efficiency, but otherwise, she could sustain concentration, persistence, or pace over two hours over a typical workday/week for simple tasks. At the reconsideration level, the psychological consultant affirmed the initial-level findings. In the hearing decision, the [ALJ] discussed the prior administrative findings but did not mention the qualifiers about episodic exacerbations and temporary difficulties maintaining cognitive efficiency. The [ALJ] neither accepted these limitations nor explained why they were rejected, contrary to Social Security Ruling 96-8p. Therefore, further consideration of the prior administrative findings is necessary.

(AR 1454) (internal citations omitted).

ALJ Menard's opinion did not follow the AC's mandate. This error was not harmless because at the July 21, 2022 hearing, Dr. Efobi testified that Plaintiff's preoccupation with fiberglass would result in off-task time "if the symptoms are present

during the period of time that you're talking about." (AR 1341.) By failing to follow the mandate, the ALJ ignored a key issue in the case.

Regarding the record as a whole, NP Currier's opinion that Plaintiff would be off task for "[m]ore than 20% of an 8 hour work day[,]" (AR 736, 2969, 2982), and absent "[m]ultiple times per week[,]"[22] (AR 739), was not "based purely on speculation[]" but rather is fully supported by the medical record. (AR 1318.) The ALJ's decision to the contrary is not supported by substantial evidence. *See Aquino v. Comm'r of Soc. Sec.*, 2023 WL 2159490, at *7 (S.D.N.Y. Feb. 22, 2023) ("The ALJ's decision must be supported by substantial evidence.").

ALJ Menard further discounted the persuasiveness of NP Currier's opinions because she is "not a mental health provider[.]" (AR 1318.) An ALJ may take specialization into account when considering the persuasiveness of a medical opinion. *See* 20 C.F.R. § 404.1520c(c)(4) ("Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."). However, generally "this factor, alone, is insufficient to discount [a non-mental health professional's] opinion[.]" *Landon v. Kijakazi*, 2022 WL 4365953, at *6 (D. Utah Sept. 21, 2022).

As Plaintiff's primary care provider, NP Currier counseled Plaintiff, coordinated her care, managed Plaintiff's medications, and treated the physical manifestation of Plaintiff's fingerpicking preoccupation, at one point clipping a piece of her left finger and sending it for evaluation. While NP Currier's lack of specialization in mental health was a factor for ALJ Menard to consider, it was not determinative. *See, e.g., Tatiana R. v.*

---

[22] Plaintiff contends that NP Currier's opinion that Plaintiff would be absent specifically "[m]ore than four days per month" is supported by and consistent with the medical record. (AR 2400.) NP Currier gave that opinion in the 2017 Statement, which does not cover the period under review. The 2020 Statement includes her opinion of absences "[m]ultiple times per week[.]" (AR 739.)

*Comm'r of Soc. Sec.*, 2019 WL 6315421, at *13 (D. Or. Sept. 3, 2019) ("Although a physician's specialty is a factor an ALJ may consider when evaluating opinion evidence, . . . [the applicable regulation] does not provide ALJ's license to reject medical opinion evidence simply because the provider is not specialist.").

Because the ALJ's conclusions regarding the opinions of NP Currier are not supported by substantial evidence and are the product of legal error, Plaintiff's motion to reverse the decision of the Commissioner is GRANTED.

## 2. Whether the ALJ Erred in Concluding that Dr. Efobi's Opinions Were Persuasive.

Plaintiff argues that ALJ Menard erred "by failing to consider the longitudinal history of [Plaintiff's] symptoms" and "relying on Dr. Efobi's focus on a couple of treatment notes in which [Plaintiff] stated that she was doing well, without also considering Dr. Efobi's opinion that [Plaintiff's] condition met Listing 12.07 in May 2017 and that her condition waxed and waned thereafter." (Doc. 12-1 at 27.) Plaintiff notes that by March 2018, her health "returned to the disabling state that Dr. Efobi found in May 2017[,]" (Doc. 12-1 at 30), so his opinion that she "was doing well between December 2017 and June 2018 is not reliable, or supported[.]" (Doc. 12-1 at 30-31.) Plaintiff contends that while Dr. Efobi testified that there were not many records from 2018, there are records during that period that demonstrate Plaintiff's fingerpicking disability persisted.

Dr. Efobi testified as an agency psychiatric medical expert at the July 21, 2022 SSA hearing, opining that Plaintiff had diagnoses of ADHD, PTSD, unspecified depression, generalized anxiety disorder, and an unspecified somatic disorder "at some point" considered to be a conversion disorder related to her finger. (AR 1338.) For the period under review, he testified that Plaintiff had the following limitations:

> (1) mild-to-moderate limitations in understanding, remembering, or applying information; (2) a moderate limitation in the interacting with others; (3) a mild limitation in concentration, persistence, or maintaining pace, and; (4) a mild limitation in adapting and managing oneself. . . . [In addition, she] was capable for performing simple tasks with occasional interaction with the public, supervisors, and coworkers.

(Doc. 14 at 8.) He opined that in May 2017 Plaintiff met Listing 12.07 due to her
fiberglass obsession, when "the records show[ed] that prior to [May 2017] she'd been in
the ER a couple times, multiple times actually for the complaints of this somatization"
involving the "belief that her finger has some foreign matter in it . . . [that's] been
bothering her and she gets anxious about it and preoccupied with it." (AR 1350.) He
noted that during the period under review:

> [T]he evidence just prior to November of 2017 and the evidence just after
> was more focused on anxiety and some of the somatic disorder but
> [Plaintiff] stated . . . she was feeling okay and she seemed more stable[.]
> . . .
>
> [On December 8, 2017], . . . [Psychotherapist DiGiorgianni] stated that
> [Plaintiff] was doing well . . . [b]ut prior to that entry . . . [in] June of 2017
> [Plaintiff and Psychotherapist DiGiorgianni] talked about the multiple visits
> to the [ER] with complaints of the fiberglass in her left index finger. So, she
> had those symptoms by June of 2017 but by December the report was that
> she was doing well. Then the next entry will be . . . in March of 2019. So, it
> appears that . . . we don't have a lot of records in 2018.

(AR 1338-40.)

With regard to Plaintiff's mental health during the period under review, Dr.
Efobi concluded that the medical records and the absence thereof indicated that
she was "doing fairly well or at least she was stable[.]" (AR 1340.) Dr. Efobi
testified that Plaintiff's fingerpicking preoccupation would result in off-task time
"if the symptoms are present during the period of time that you're talking about."
(AR 1341.) He stated that Plaintiff's fingerpicking preoccupation "waxes and
wanes. There are periods when it's less prominent and there are periods when it's
more prominent." *Id.*

In evaluating Dr. Efobi's testimony, ALJ Menard noted that he referenced the
record to support his findings, was available at the hearing for questioning, and his
opinion was consistent with the record, "including the nature of [Plaintiff's] treatment,
the overall benign findings on mental status examinations, and descriptions in the record
of improvement in [Plaintiff's] symptoms over and just following the relevant period[.]"
(AR 1316.) Dr. Efobi's review of the "complete record[]" and opinion "within his area of

specialization" contributed to the persuasiveness of his opinions and he "provided reasonable explanations" as to why the opinions of Plaintiff's treating providers were inconsistent with the record. *Id.* ALJ Menard found Dr. Efobi's testimony "most persuasive in assessing [Plaintiff's] mental [RFC]." *Id.*

ALJ Menard adopted Dr. Efobi's inaccurate description of Plaintiff's medical history in his Step Four determination, explaining:

> In addition to [Plaintiff's] physical impairments, [Plaintiff] has also been diagnosed with an anxiety disorder, depressive disorder, [PTSD], and [ADHD]. [Plaintiff] has reported symptoms associated with these impairments, including persistent intrusive concerns over fiberglass in her fingers[.] . . . [Plaintiff] has regularly been described as severely concerned over fiberglass in her hands, despite the lack of objective evidence to support her concern.
>
> . . .
>
> Nonetheless, [she] received no specialized psychiatric medication management for this condition over the relevant period and instead, it was managed with medication prescribed by [her] primary care provider as well as intermittent participation in individual therapy until August 2019. With this treatment, [Plaintiff] reported improvement in her symptoms, and [in] December 2017 reported that she had been doing well. In January 2018, treatment notes indicate that [Plaintiff's] OCD around her finger issue was not at the forefront of the meeting, which was both an improvement and change from previous encounters. Moreover, just following the relevant period, [Plaintiff] also admitted to doing pretty well overall and doing the best she had in a while. [Plaintiff's] own descriptions of her symptoms as improved during the relevant period[] and just following are inconsistent with a finding of greater limitations than those included in the above [RFC].

(AR 1314-15) (internal citations omitted).

"Courts in this Circuit long have casted doubt on assigning significant weight to the opinions of consultative examiners when those opinions are based solely on a review of the record." *Soto v. Comm'r of Soc. Sec.*, 2020 WL 5820566, at *7 (E.D.N.Y. Sept. 30, 2020); *see also* 20 C.F.R. § 404.1520c(c)(3)(v) ("Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.").

In addressing the persuasiveness of Dr. Efobi's testimony, ALJ Menard

emphasized its consistency with the record during the period under review. However, records from 2017 include contrary evidence,[23] and multiple records from 2018 were apparently not considered.[24]

The medical record demonstrates that Plaintiff's fingerpicking preoccupation waxed and waned but never ceased and was present before and throughout the relevant period. The ALJ's conclusion to the contrary is not supported by substantial evidence and was the product of legal error. *See Colgan*, 22 F.4th at 362 ("[A]n ALJ commits legal error in resting his disability determination on 'a one-time snapshot of a claimant's status' because that episode 'may not be indicative of her longitudinal mental health.'") (citing *Estrella*, 925 F.3d at 98); *see also Estrella*, 925 F.3d at 97 ("Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.") (alteration in original) (citation and internal quotation marks omitted); *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) ("We are mindful that it is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased.") (alteration, citation, and internal quotation marks omitted).

---

[23] On October 6, 2017, Psychotherapist DiGiorgianni noted that Plaintiff "was 'close to being' done with her finger, having 'drawn blood' and gotten some of the fibrous material out of the finger." (AR 654.) On December 8, 2017, he observed that Plaintiff "related that she has been doing well" but also indicated that she "feels as though she is 'very close' to getting out the foreign material in her finger[.]" (AR 652.) On November 2, 2017, NP Currier observed that Plaintiff was [d]oing well overall[,]" (AR 419), but on December 22, 2017, noted that Plaintiff "continues to pick at her finger[,] and she is confident that there is fiberglass in it." (AR 416.)

[24] During a March 22, 2018 ER visit, Plaintiff described "10/10" pain and how she recently tried to cut out part of her finger to remove the perceived fiberglass. (AR 406.) In March 26, 2018 treatment notes, PA Kavouksorian noted the "10/10" pain in Plaintiff's finger, that Plaintiff requested amputation, and that there was "extremely thickened callused skin over the left index finger[]" with "[s]ensation diminished[.]" (AR 404-05.) On May 10, 2018, NP Currier explained that Plaintiff was "[b]asically house bound" and "[s]till picking at her finger[,]" "[w]ork[ing] on it [more than] 18 hours a day[]" "[w]henever she is awake she is trying to get out the fiberglass." (AR 398.)

The "ALJ erred in placing substantial weight on [Dr. Efobi's] possibly ill-founded opinion," because [Dr. Efobi] did not consider the entire record. *Tarsia v. Astrue*, 2011 WL 1313699, at *18 (2d Cir. Apr. 7, 2011). This error was not harmless because Dr. Efobi testified that Plaintiff's fingerpicking preoccupation would lead to significant off-task time and would satisfy a Listing "if the symptoms are present during the period of time that you're talking about." (AR 1341.) As a result, Plaintiff's motion to reverse the decision of the Commissioner is GRANTED.

**D.    Whether the ALJ Erred by Failing to Find Manipulative Limitations.**

Plaintiff argues that the record does not support the ALJ's finding that Plaintiff had no manipulative limitations for handling and fingering activities.

VE Taitz testified that the only job someone could perform with the limitations described in the ALJ's hypothetical was housekeeping. In this position, he stated that "up to one day[,]" (AR 1361), of absence and "[u]p to 15 percent[]" of off-task time would be tolerated. (AR 1362.) He also stated that if an individual could do handling or fingering activities "only up to one third [of a day,] they would not be able to do that job." *Id.*

ALJ Menard relied on the opinions of non-examining state-agency physicians Drs. Cook and Schumacher, who completed RFC assessments in June and August 2019, respectively, and concluded that Plaintiff did not have manipulative limitations. However, NP Currier marked the checkbox that Plaintiff's ability to perform handling or fingering was for "less than 1/3 of the work day[.]" (AR 738, 2971, 2984.) She believed Plaintiff would be off task for "[m]ore than 20% of an 8 hour work day[,]" (AR 736, 2969, 2982), and absent "[m]ultiple times per week[.]" (AR 739.)

Various medical records comport with NP Currier's findings. After examining Plaintiff at a June 21, 2017 ER visit, PA Paul Jerard observed "chronically inflamed eczematous appearing left index finger with cracking and calluses[]" showing "[m]ultiple cracks in the skin and mild patchy redness." (AR 2384.) In March 26, 2018 treatment notes, PA Kavouksorian recorded "extremely thickened callused skin over the left index finger[]" with "[s]ensation diminished[.]" (AR 405.) The court agrees with Plaintiff's assertion that "[t]his abnormal condition of [her] left index finger would certainly support

33

an opinion that [she] was limited in her ability to do manipulative activities such as handling and fingering." (Doc. 12-1 at 34.)

Because the ALJ erred in failing to fully consider the impact of Plaintiff's somatic disorder on her manipulative limitations, the court GRANTS Plaintiff's motion to reverse the decision of the Commissioner.

## E.     Whether the Court Should Find Plaintiff Disabled and Remand for Calculation of Benefits.

Plaintiff asserts that the record supports a finding that she is disabled and a remand for calculation of benefits is warranted. Remand for the calculation of benefits is appropriate in cases where "the records provided persuasive evidence of total disability that rendered any further proceedings pointless." *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999); *see also Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990) (remanding for calculation of benefits where there was an "infinitesimal likelihood that employment of any kind would be available" to claimant).

The record in this case is robust and contains ample evidence of disability. The Appeals Council provided an opportunity to reconsider the record and remanded for that purpose, but the mandate was all but ignored.

In this case, the ALJ failed to consider Listing 12.07 and committed legal error in analyzing NP Currier's and Dr. Efobi's opinions. Had the proper legal standards been applied, a rational decision-maker would be compelled to conclude that Plaintiff was disabled and that her disability satisfied a Listing. If a claimant satisfies a Listing, she or he has an impairment that is "consider[ed] to be severe enough to prevent an individual from doing any gainful activity[.]" 20 C.F.R. § 404.1525(a); *see Nieves v. Sec'y of Health & Hum. Servs.*, 775 F.2d 12, 13 (1st Cir. 1985) ("Under 20 C.F.R. § 404.1520(a) & (d), if the claimant meets a listed impairment, the Secretary is required to find a claimant disabled and not consider whether he or she could perform other work.").

A remand for calculation of benefits is warranted, where, as here, there is "no apparent basis to conclude that a more complete record might support the

34

Commissioner's decision[.]" *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999).[25] "When an 'ALJ's reasons for rejecting the claimant's [evidence] are legally insufficient and it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's [evidence],' we remand for a calculation of benefits." *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003)). As one court observed in similar circumstances:

> Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.' " *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405(g) (fourth sentence)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue*, No. 06 CV 4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008).

> On the other hand, the Appeals Council has previously remanded to the ALJ, and Plaintiff initially applied for DIB over six and one half years ago. Further delay in the resolution of Plaintiff's claim is unwarranted under the circumstances of this case. Under the Act, a court "shall have power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (fourth sentence). "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," the Second Circuit has indicated that remand "for further development of the evidence" is proper. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir.

---

[25] *See also Hodgkin v. Comm'r of Soc. Sec.*, 612 F. Supp. 3d 173, 183-84 (W.D.N.Y. 2020) (explaining that "[t]he record in this case is extensive and contains a comprehensive set of treatment notes[,]" so "[u]nder these circumstances, a remand for further administrative proceedings is not warranted because there are no inconsistencies or gaps in the record and further evidence does not need to be developed"); *Bradley v. Colvin*, 110 F. Supp. 3d 429, 447 (E.D.N.Y. 2015) (remanding for calculation of benefits where "the ALJ disregarded a well-developed record with little explanation, giving the [c]ourt no basis to conclude that remanding to obtain additional evidence would support the Commissioner's decision") (citation and internal quotation marks omitted); *Henningsen v. Comm'r of Soc. Sec. Admin.*, 111 F. Supp. 3d 250, 272-73 (E.D.N.Y. 2015) ("Because the record provides persuasive proof of plaintiff's disability, [and] proper application of the legal standards would not contradict the weight of this evidence in the record, . . . the proper course of action is to reverse the ALJ [d]ecision and remand the matter to the Commissioner for a calculation of disability benefits.") (citation and internal quotation marks omitted).

1999) (internal citations omitted).

> In other situations, where [the] Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the Court has] opted simply to remand for a calculation of benefits." *Id.* at 83. A remand for calculation of benefits is warranted "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *see also Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004).

*Mortise v. Astrue*, 713 F. Supp. 2d 111, 128 (N.D.N.Y. 2010) (alterations in original). Here, the court reaches the conclusion that further administrative proceedings would yield no additional evidence necessary for a disability determination and a rational decision-maker would be compelled to find Plaintiff disabled. Based on the foregoing, the court remands for a calculation of benefits.

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. 12), DENIES the Commissioner's motion to affirm (Doc. 14), and REMANDS the case for a calculation of benefits. SO ORDERED.

Dated at Burlington, in the District of Vermont, this 15th day of March, 2024.

Christina Reiss, District Judge
United States District Court